IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH DEMI.YELLOWLODGE, DEMI.BLACKKBEAARR, JOSUE.MENDOZA.54390, TINA.VASQUEZ.94, AND 100009356829628, THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | Case No. 1:18-mj-265 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Megan P. Bennett, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with two certain accounts that are stored at premises owned, maintained, controlled, or operated by Facebook, Inc. ("Facebook"), a company headquartered at 1601 Willow Road, Menlo Park, California, 94025. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the account, including the contents of communications.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since May 2009. I am assigned to the FBI Minot Resident Agency, and my work primarily

consists of investigating felony crimes in Indian Country, including felony crimes on the Fort Berthold Indian Reservation.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement investigators and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code §§ 2242 (sexual abuse) and 2243 (sexual abuse of a minor) ("the violations") have been committed by Josue Enrique Mendoza. There is also probable cause to search the information described in Exhibit A for evidence of the violations, as described in Exhibit B. Specifically, I believe probable cause exists that Mendoza and others utilized Messenger, an application used within Facebook, Inc. accounts, to communicate with victim D.Y. before and after Mendoza's alleged sexual acts with D.Y. In April 2018, D.Y. was a fourteen year old minor female. D.Y. is an enrolled member of the Three Affiliated Tribes.

## PROBABLE CAUSE

5.      On July 31, 2018, I interviewed D.Y. and she told me about how she and two other individuals (Tina Vasquez and "Josh") went to Mendoza's apartment at the Fox Run apartment complex in New Town, North Dakota. Vasquez was twenty-seven years old and Josh's age is not known at this time. Prior to speaking with D.Y., I had obtained a written report of an April 17, 2018 interview of D.Y. conducted by Three Affiliated Tribes (TAT) law enforcement. The TAT report stated D.Y. reported to TAT that she was sexually assaulted on

2

April 9 or 10, 2018 at the Fox Run apartment complex. I am familiar with the Fox Run apartment complex and know it to be located in New Town, North Dakota, which is within the exterior boundaries of Fort Berthold Indian Reservation.

6.  D.Y. told me that on the day she went to Fox Run apartment complex, D.Y. had been drinking alcohol to the point where Vasquez told her to slow down her alcohol consumption. D.Y. also stated that she ingested a tab of something that she was told was "acid" and was "high" on "weed."

7.  That day, D.Y. had been using Facebook Messenger on Vasquez's cell phone to communicate with Mendoza about hanging out at his apartment. D.Y. utilizes her friend's cell phones and Messenger accounts to contact others because D.Y. does not often have a cell phone of her own. D.Y. has Facebook accounts of her own, including accounts where her name appears as Demi Montoya, Demi Perez, and Demi Yellowlodge. Some of D.Y.'s accounts may have been deleted or deactivated, and investigation to determine this status continues.

8.  D.Y. had first learned about Mendoza sometime after Christmas 2017, after he used Messenger to contact her on Facebook. D.Y. had briefly seen Mendoza in person prior to that day, but they had never "hung out" together. Through Messenger, D.Y. had told Mendoza she was sixteen years old.

9.  Late in the day, on approximately April 9 or 10, 2018, Mendoza and D.Y. were in contact with each other over Messenger, and Mendoza provided D.Y. with his apartment number. Mendoza also told her that the door to his apartment would be open, that she should be quiet and just walk in to the apartment, and that she would see his room when she walked in the apartment. D.Y., Vasquez, and Josh went to the apartment unit, and Mendoza was there. D.Y.

3

and Vasquez were offered a brown beverage by Mendoza. Vasquez refused the beverage but D.Y. drank it.

10.     D.Y., Vasquez, Josh, and Mendoza, sat or lied down on the bed in the room where Mendoza was. D.Y. felt dizzy. After perhaps approximately twenty minutes, Vasquez and Josh indicated they were leaving. Mendoza told D.Y. to "hold up" so he could talk to her, and D.Y. told Vasquez and Josh that she would briefly stay to talk to Mendoza. Vasquez and Josh left the apartment. D.Y. and Mendoza were then alone in the room.

11.     D.Y. fell asleep on the bed. When she woke up, Mendoza was having sexual intercourse with her, which to D.Y. meant that his penis was in her vagina. She told him to stop. He started laughing and told her to "just take it". D.Y. recalled pushing him off and turning to her side, trying to go back to sleep. She felt aches and cramping. Mendoza grabbed her leg and had sexual intercourse with her again. D.Y. told me she moved her body so that it was a struggle for him to keep going, and he got mad and sat up in bed and checked his phone. He put down his phone, grabbed a towel, and gave it to D.Y. D.Y. wiped herself with the towel. At one point during or after Mendoza had sexual intercourse with D.Y., he told her she "sucked at" having sex.

12.     D.Y. felt dizzy and nauseous. It was easy to fall asleep so D.Y. lied down again went back to sleep. D.Y. did not feel free to leave the apartment because she was not familiar with her surroundings and believed Mendoza would get mad at her. D.Y. did not have a cell phone with her at Mendoza's apartment.

13.     When D.Y. awoke, Mendoza was getting ready for work. He was in the living room. D.Y.'s vaginal and hip areas were sore and she felt pain when she walked. D.Y. asked

Mendoza to contact Vasquez multiple times. At some point, D.Y. was able to log in to Vasquez's Facebook account use Messenger to contact Laurie Yellow Lodge and arrange for someone to pick up D.Y. from the apartment complex.

14. D.Y. stated that she did not immediately report being sexually assaulted by Mendoza because some of D.Y.'s friends told her his "homeboys" would come after her. D.Y. was afraid of being threatened, assaulted, or killed.

15. I showed D.Y. a screen capture from a Facebook account I located at www.facebook.com/josue.mendoza.54390. The screen capture contained a photograph of a male whose appearance was consistent to a Colorado driver's license department photograph for Josue Enrique Mendoza (year of birth 1997) with writing in part "Josue Mendoza (Yung g Money [Emoticons])". D.Y. confirmed that she recognized the male in the screen capture as the Josue Mendoza who had sexually assaulted her.

16. Mendoza was interviewed by TAT law enforcement on April 17, 2018. Mendoza denied having sexual contact with D.Y. but confirmed D.Y. and another female he believed to be D.Y.'s sister had been to his apartment, and D.Y. and the other female were "fucked up", but not "all out of it". Mendoza referred to D.Y. as a "little girl". Mendoza confirmed he had a Facebook account, describing its contents being "straight criminality" and that it contained things that law enforcement might find to be "a little off".

17. I located Facebook, Inc. account profile pages which appeared to be attributable (based on their publicly available content, such as names and photographs) to D.Y., Mendoza, Vasquez, and Yellow Lodge. The profile pages were located at www.facebook.com/demi.blackkbeaarr, www.facebook.com/demi.yellowlodge,

www.facebook.com/josue.mendoza.54390, www.facebook.com/tina.vasquez.94, and www.facebook.com/profile.php?id=100009356829628 (collectively, "the profile pages").

18. To preserve the content of the profile pages, I used a Facebook records preservation function provided by the company for the use of law enforcement officials. Using the instructions provided by Facebook, I requested Facebook preserve the content of the profile pages. I then received electronic responses from Facebook, Inc. notifying me that Facebook, Inc. took steps to preserve the content.

13. Facebook retains information provided or created by Facebook users. A Facebook policy page (located at https://www.facebook.com/policy.php on July 19, 2018) stated in part that Facebook does "collect the content and other information you provide when you use our Services, including when you sign up for an account, create or share, and message or communicate with others. This can include information in or about the content you provide, such as the location of a photo or the date a file was created. We also collect information about how you use our Services, such as the types of content you view or engage with or the frequency and duration of your activities. […]

"We also collect content and information that other people provide when they use our Services, including information about you, such as when they share a photo of you, send a message to you, or upload, sync or import your contact information.

"We collect information about the people and groups you are connected to and how you interact with them, such as the people you communicate with the most or the groups you like to share with. We also collect contact information you provide if you upload, sync or import this information (such as an address book) from a device.

"If you use our Services for purchases or financial transactions (like when you buy something on Facebook, make a purchase in a game, or make a donation), we collect information about the purchase or transaction. This includes your payment information, such as your credit or debit card number and other card information, and other account and authentication information, as well as billing, shipping and contact details.

"We collect information from or about the computers, phones, or other devices where you install or access our Services, depending on the permissions you've granted. We may associate the information we collect from your different devices, which helps us provide consistent Services across your devices. Here are some examples of the device information we collect:

- Attributes such as the operating system, hardware version, device settings, file and software names and types, battery and signal strength, and device identifiers.
- Device locations, including specific geographic locations, such as through GPS, Bluetooth, or WiFi signals.
- Connection information such as the name of your mobile operator or ISP, browser type, language and time zone, mobile phone number and IP address.

"We collect information when you visit or use third-party websites and apps that use our Services (like when they offer our Like button or Facebook Log In or use our measurement and advertising services). This includes information about the websites and apps you visit, your use of our Services on those websites and apps, as well as information the developer or publisher of the app or website provides to you or us. […]

"We receive information about you from companies that are owned or operated by Facebook, in accordance with their terms and policies. […]"

19.     Based on this information provided by Facebook, I believe there is information retained by Facebook, Inc. that may provide information about D.Y.'s communications with

7

Mendoza and others on the approximate dates when the sexual assaults allegedly occurred (see Exhibit B). Because of D.Y.'s uncertainty as to the precise dates the sexual assaults occurred, I am requesting records from a wider date range than the April 9 to 10, 2018 range stated in TAT's April 17, 2018 interview report.

20. In addition to textual information, the Internet Protocol addresses and digital device identifying numbers, collected by Facebook through its normal operations, may provide investigators with additional evidence regarding the origins of the communications sent and received by D.Y., Mendoza, Vasquez, and Yellow Lodge.

21. The content of the communications sent and received by D.Y., Mendoza, Vasquez, and Yellow Lodge is germane to the allegation that violations of Title 18, United States Code §§ 2242 and 2243 were committed by Mendoza on or about April 9 and 10, 2018.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

22. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook, Inc., to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

23. Based on the forgoing, I request that the Court issue the proposed search warrant.

24. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. See 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." See 18 U.S.C. § 2711(3)(A)(i).

25. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

*Megan Bennett*

Megan P. Bennett
Special Agent
Federal Bureau of Investigation

Subscribed and Sworn to before me on 21s day of August, 2018 by telphone cnfuacc.

*[signature]*

CHARLES S. MILLER, JR.
UNITED STATES MAGISTRATE JUDGE